Samuel KOHN Plaintiff,

v.

AT & T CORP., the WorldPartners Company, Bruce Leasure and Kamie Zaracki Defendants.

No. CIV. A. 99–102(AJL).

United States District Court, D. New Jersey.

June 21, 1999.

394

Allan R. Freedman, Teaneck, NJ, for Plaintiff.

Francis X. Dee, David J. Reilly, Mason C. Miller, Carpenter, Bennett & Morrissey, Newark, NJ, for Defendants.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Samuel Kohn ("Kohn") against New Jersey defendants AT & T Corp. ("AT & T"), The WorldPartners Company ("WPC"), Bruce Leasure ("Leasure") and Kamie Zaracki ("Zaracki")(collectively, the "Defendants"). In an amended complaint (the "Amended Complaint"), filed on 21 January 1999, Kohn alleges violations of Title VII of the Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e-1, *et seq.*, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*, the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.* and

State law claims for violations of the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1, and defamation.

Presently pending is a motion by the Defendants for summary judgment (the "Summary Judgment Motion") pursuant to Fed.R.Civ.P. 56 ("Rule 56").[1] For the reasons which follow, the Summary Judgment Motion is granted. The remaining State law claims are dismissed without prejudice.

*Background*

A. *Facts*

1. *Parties*

Kohn, a fifty-two year old Jewish male, was hired by AT & T on or about 1 February 1997. *See* Amended Complaint at ¶¶ 3, 5 and 6; Defendants' Rule 56.1 Statement at ¶ 1; Kohn Dep. at 46:24–

1. In support of the Summary Judgment Motion, the Defendants submitted: a Local Civil Rule 56.1 Statement (the "Defendants' Rule 56.1 Statement"); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (the "Moving Brief"), attaching Exhibit A; Affidavit of David J. Reilly, Esq. (the "Reilly Aff."), attaching Exhibits A and B; Affidavit of Kamie Zaracki (the "Zaracki Aff."), attaching Exhibits A through J; and Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment (the "Reply Brief").

In opposition to the Summary Judgment Motion, Kohn submitted: Plaintiff's Response and Statement Under Rule 56.1 (the "Original Kohn Rule 56.1 Statement"); Plaintiff's Response and Statement Under Rule 56.1 (Amended)(the "Amended Kohn Rule 56.1 Statement"); Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment (the "Opposition Brief"); Certification of Samuel Kohn (the "Kohn Certif."); Certification of Allan R. Freedman, Esq. (the "Freedman Certif.") and the deposition transcript of Samuel Kohn, dated 15 March 1999, (the "Kohn Dep.").

Kohn and his attorney, Allan R. Freedman, Esq. ("Freedman") did not submit affidavits in opposition to the Summary Judgment Motion. They instead submitted certifications which failed to state or acknowledge the data contained therein were submitted under the penalty of perjury. To survive a properly supported motion for summary judgment, the

nonmovant must "proffer evidence significantly probative of the validity of his [or her] claims." *Padillas v. Stork–Gamco, Inc.*, No. 95–7090, 1997 WL 597655, at *3 (E.D.Pa. Sept. 19, 1997)(citing *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see Coolspring Stone Supply, Inc. v. Am. States Life Ins.*, 10 F.3d 144, 147 (3d Cir.1993); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 439 (3d Cir.1982); *Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 564 (3d Cir.1976). Unsworn declarations not filed under penalty of perjury fail to satisfy the requirements of Rule 56. *See Small v. Lehman*, 98 F.3d 762, 765 n.5 (3d Cir.1996)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir.1994); *Radich v. Goode*, 886 F.2d 1391, 1394 (3d Cir.1989); *United States v. Branella*, 972 F.Supp. 294, 300 (D.N.J.1997); *Maietta v. United Parcel Service, Inc.*, 749 F.Supp. 1344, 1362 (D.N.J.), *aff'd*, 932 F.2d 960 (3d Cir. 1991); *Fucci v. Graduate Hospital*, 969 F.Supp. 310, 315 n. 8 (E.D.Pa.1997); *Brist v. County of Delaware*, No. 94–1426, 1996 WL 75889, at *4 n. 9 (E.D.Pa. Feb. 22, 1996), *aff'd*, 101 F.3d 689 (3d Cir.1996); *Soil Remediation of Philadelphia v. Eclipse Combustion*, No. 95–591, 1995 WL 590176, at *2–3 (E.D.Pa. Oct. 5, 1995).

The Kohn Certification and Freedman Certification are accepted under Fed.R.Civ.P. 11 ("Rule 11") and Fed.R.Civ.P. 56(g)("Rule 56(g)").

$47:4.$[2] In or about March 1996, Kohn accepted an assignment with WPC, an affiliate of AT & T. Amended Complaint at ¶ 7; Defendants' Rule 56.1 Statement at ¶ 2. Kohn assumed the position of Manager of Pricing and Business Analysis with WPC, *id.* at ¶ 3, while remaining an employee of AT & T. Amended Complaint at ¶ 8; Defendants' Rule 56.1 Statement at ¶ 2.

As Manager of Pricing and Business Analysis, Kohn was responsible for, among other things, negotiating an Integrated Global Discount ("IGD") among various telephone companies, Amended Complaint at ¶ 22, and compiling and maintaining a price book which analyzed prices charged by telephone companies. *Id.* at ¶ 29.

Kohn reported directly to Zaracki, then Director of Marketing and Acting Vice President of Marketing for WPC. Defendants' Rule 56.1 Statement at ¶ 3. When Leasure became Vice President of Marketing in or about September 1996, Zaracki began reporting to Leasure, who in turn reported to Simon Krieger ("Krieger"), President of WPC. *Id.; see also* Zaracki Aff. at ¶ 2.

### 2. *Performance Reviews of Kohn*

*According to Zaracki, during the second half of 1996, she began receiving complaints concerning the work performance of Kohn.* Zaracki Aff. at ¶ 3. Specifically, in August 1996, Zaracki states she was apprised of two incidents where Kohn engaged in sexually harassing behavior towards two female employees. *Id.* Kohn, however, denies having engaged in any sexually harassment. *See* Amended Kohn Rule 56.1 Statement at ¶¶ 4, 20. Zaracki nevertheless states she investigated these incidents and counseled Kohn concerning his inappropriate behavior. Zaracki Aff. at ¶ 3.[3]

In or about August 1996, Zaracki states she again met with Kohn (the "August 1996 Meeting") to discuss a "Career Plan Summary" of the performance expectations and future goals of Kohn. *Id.* at ¶ 4.[4] The Career Plan Summary states, in relevant part:

[Kohn] desires to further his advancement within AT & T and to obtain an overseas assignment. To indicate his readiness for such advancement, [Kohn] must demonstrate:

● Subject matter expertise in the area of international pricing and the relevant WPC/WPA processes and policies associated with influencing of pricing strategy Worl dSource$^{SM}$ Services across the Association.

● Successful leadership of a broad range of Partnership, WPC and Member teams in the achievement of mutual goals/objectives for WorldSource$^{SM}$ Services.

[Kohn] has only just joined WPC as the Pricing and Business Analysis Manager. He should continue in this position for at least 2 more years. This position will give [Kohn] the opportunities to demonstrate his readiness for advancement or placement in an overseas assignment. To facilitate this personal development, [Kohn] should concentrate his efforts in the following areas:

1. Improving his interpersonal skills and cultural awareness by demonstrating effective relationship management with peers, customers and suppliers—recognizing cultural differences and modifying his management approach to their needs.

2. Improving his ability to plan and organizing work activities. [Kohn] must focus on 'making it easy' for others to support his projects, com-

---

**2.** As noted, Kohn submitted the complete transcript of the Kohn Deposition taken on 15 March 1999. Relevant portions of the same deposition transcript also are attached as Exhibit A to the Reilly Affidavit.

**3.** A copy of notes prepared by Zaracki describing "a sexual harassment situation" involving Kohn are attached to the Zaracki Affidavit as Exhibit A.

**4.** A copy of the Career Plan Summary, dated 19 August 1996, is attached to the Zaracki Affidavit as Exhibit B.

plete activities necessary for WPC success, etc.

3. Demonstrate his willingness and ability to help others succeed while ensuring that his business objectives are also being met. This will require [Kohn] to successful [sic] multi-task while producing quality work on time.

*Career Plan Summary.* Zaracki states that during the August 1996 Meeting, she advised Kohn he needed to improve upon his interpersonal skills, cultural awareness and ability to plan and organize work activities. Zaracki Aff. at ¶ 4.

Following the August 1996 Meeting, Zaracki states she "continued to receive complaints about Kohn's work performance and his interactions with other employees." *Id.* at ¶ 5. Zaracki also states she personally observed "deficiencies in Kohn's performance, including the fact that he was missing commitments and was having difficulty managing his projects." *Id.* As a result, Zaracki states she held a "coaching/feedback session" with Kohn in October 1996 (the "October 1996 Feedback Session") to help Kohn improve his performance. *Id.* She describes the session as follows:

During this session, I advised Kohn that his work performance was declining and that his peers and clients were complaining about his behavior and lack of respect, and that if he did not improve, he would be in danger of receiving a 'Partially Met' appraisal rating for the year. I also provided Kohn with a Coaching/Feedback [D]ocument[5] which described his career objectives and detailed the skills needed for him to succeed.

*Id.*

During the October 1996 Feedback Session, Zaracki states she also provided Kohn with a written Development Plan detailing her expectations for him for the remainder of 1996. *See id.* at ¶ 6.[6]

Also during the October 1996 Feedback Session, Zaracki states she "discussed with, and provided to, Kohn, numerous examples of his inappropriate behaviors and performance deficiencies." *Id.* She additionally states she prepared and provided to Kohn a document entitled "Illus-

---

5. A copy of the Coaching/Feedback Document is attached to the Zaracki Affidavit as Exhibit C. The Coaching/Feedback document listed the "attributes that signal readiness" for an oversees assignment or a promotion to district manager and the "skills required for success" in these positions. *See* Coaching/Feedback Document.

6. A copy of the Development Plan is attached to the Zaracki Affidavit as Exhibit D. The Development Plan provides:

1. Contact EAP
— Carol Caudill (908) 234-3383
2. Complete all documentation required to support IGD Trial by 11/22.
   ● Trial processes, documentation, job aids
   ● Member communications material
   ● Review with supervisor prior to distribution—incorporate any required changes
3. Complete distribution of relevant IGD communications material to Members by 11/27. Conduct teleconference with Members participating in the trial by 12/6.
4. Complete development and delivery of price book update process by 11/22.
   ● Process flow and associated documentation

● Executed once for PL
● Distribute updated PL price book to Member/WPC PL Product Managers
● Distribute FR price book to Member/WPC FR Product Managers
● Review with supervisor prior to distribution—incorporate any required changes
5. Develop draft of WorldSource Pricing Strategy Document by 12/20.
   ● WPC document format required
   ● Review with supervisor—incorporate any required changes
6. Continue to manage and support GPP
   ● Meeting scheduled, minutes prepared and distributed
7. Schedule 2–one hour status meetings per week with supervisor
   ● One each at the beginning and end of the week
   ● Be prepared to provide written action plan on what will be accomplished that week during the beginning-of-week meeting and status of what was accomplished during the end-of-week meeting
   ● Content related meetings are to be scheduled in addition to status meetings as needed
Development Plan.

trative Examples—S. Kohn Development Opportunities" (the "Illustrative Examples Document") which detailed examples of his inappropriate behavior.[7] Zaracki then recommended Kohn contact the Employee Assistance Program. Zaracki Aff. at ¶ 6.

According to Zaracki, Kohn "did not satisfactorily complete the Development Plan[.]" *Id.*[8]

Kohn, by contrast, denied:

> that Ms. Zaracki 'continued to receive complaints' about [his] performance and interactions 'throughout the second half of 1996.' There was only one instance during that period when this was brought to [his] attention, . . . [by way of the Illustrative Examples Document]. When [Kohn] followed up with the individuals identified [in the document], [he] discovered that they denied complaining or reporting the incidents reflected in the document. [He] conclude[d] that this document is simply further evidence of Ms. Zaracki's attacks on [him].

Kohn Certif. at ¶ 28. He further states:

> Ms. Zaracki's characterizations of the [October 1996 Feedback Session] is [sic]

7. A copy of the Illustrative Examples Document is attached to the Zaracki Affidavit as Exhibit E. It provides:

> Argumentative Posture:
> - Need for price book update process, legal issues
> - Whether or not AT & T IGD meeting was "successful"
> - How to proceed with all day meeting (10/9)
> - Whether or not the IGD project is behind schedule
> - Whether or not [Kohn] demonstrates use of IGD project plan
> Inappropriate Comments:
> - "I'll kill you" to Long Lam
> - Phone episode with Lukas' friend
> - "Because I wanted to piss you off" to Irwin Fouwels
> - "Cliff I want you now"
> - "I'm not happy" to [Zaracki]
> - "Well if you don't care about the quality . . ." To [Zaracki]
> - "Don't you know what you are doing" to Cliff Ting
> Inability to Control Temper and Displays of Immature Behavior:
> - Shouting at Cliff to help you
> - Acting impatient with supervisor in open office area
> - Clowning in the office
> - Carrying argument in loud whiney voice with supervisor into open office area
> - Being very controlling of peer's [sic] time
> - Chastising supervisor for not acknowledging FR price book activity
> Lack of Courtesy and Professional Demeanor:
> - Letters to CHT-I and others on FR price questions
> Not Always Respectful of Others:
> - Yelling at people: Cliff, Kurt, [Zaracki]
> - Expecting others to deal with you and your needs "on demand"
> - Expressing extreme displeasure when people are either unwilling or unable to do so (i.e. Cliff, Kurt: help w/ PC; [Zaracki]: FR price book, prior to meeting w/ FI & my requirement to leave promptly at 5pm)
> Recognizing Supervisor's Role, Responsibility:
> - Business requirement for price book distribution, update process, timeframe
> - Role in representing WPC posiiton [sic] at AT & T IGD meeting

Illustrative Examples Document.

8. The progress of Kohn was summarized in a document prepared by Zaracki entitled, "Status of S. Kohn's Performance on Development Plan," (the "Status of Performance Document") a copy of which is attached to the Zaracki Affidavit as Exhibit F. The Status of Performance Document, dated 18 February 1997, states:

> 1. [Kohn] did contact EAP.
> 2. [Kohn] did not complete IGD Trial documentation by 11/22. Progress was so slow and IGD Team members were becoming so frustrated with the lack of effective project management displayed by Sam that I (Kami Zaracki) took over the project manager role for the IGD and removed [Kohn] from the project.
> 3. [Kohn] did not complete these activities because he was removed from the project.
> 4. [Kohn] did not complete these activities by 11/22. They were completed week of 2/16/96.
> 5. [Kohn's] outline of the Strategic pricing document was not acceptable. He did not incorporate my comments by 12/20, nor did he revise the outline as requested.
> 6. It was not necessary to hold a GPP meeting.
> 7. [Kohn] did schedule regular meetings with his supervisor.

Status of Performance Document.

also false. She did not advise me at that time that my work performance was declining and that peers and clients were complaining .... The coaching/feedback session was addressed simply to my getting a promotion and an overseas assignment, developments which reflected the opposite of declining performance and increasing complaints. I deny Ms. Zaracki's statements that I was missing commitments and having difficulty managing my projects.

*Id.* at ¶ 29.

Kohn asserts the "difficulties arose because of Ms. Zaracki's disregard for the legal problems raised by her instructions to me." *Id.* Specifically, Kohn states he "objected to carrying out [Zaracki's] instructions with respect to distributing certain price books because of antitrust reasons discussed with legal counsel for AT & T." *Id.* at ¶ 4; *see also* Amended Complaint at ¶¶ 30–31 (alleging that communications among telephone companies concerning pricing and publication of prices the companies agreed to charge violates antitrust laws).[9] He likewise alleges he failed to complete the IGD process development and trial documentation because "communications among different telephone companies concerning that 'integrated global discount' may reasonably be thought to constitute a violation of the antitrust laws." Amended Complaint at ¶ 23; *see also id.* at ¶¶ 25–27; Kohn Certif. at ¶¶ 4, 5.

Kohn further asserts he "successfully completed in all material respects the [Development] Plan, insofar as it could be completed, without giving effect to illegal actions." Kohn Certif. at ¶ 8. Kohn opines his sensitivity to these alleged legal problems "prevented AT & T and the members of [WPC] from the legal liability that would have followed" had he completed his assigned tasks. *Id.* at ¶ 5.

It appears from a memorandum sent by Zaracki to Kohn, dated 29 October 1996, (the 29 October 1996 Memorandum) that Kohn was informed there were no legal impediments to completing his assignments. *See* 29 October 1996 Memorandum.[10] Kohn was directed to complete his projects, which had been "clearly identified" in his objectives since the preceding April, notwithstanding his reservations. *See id.*

### 3. *Alleged Disability*

Kohn additionally states he informed Zaracki during the August 1996 Meeting that he suffered from attention deficit disorder ("ADD"). *See* Kohn Dep. at 281:5–23; Kohn Certif. at ¶ 27; Amended Complaint at ¶ 5. According to Kohn, during that meeting he "asked [Zaracki] to speak with [his] physician to get details on the required accomodations [sic]; she declined. Only several months later did she refer it to [the Health Affairs division of AT & T ("Health Affairs")], and it was not until late February [of 1997], some six months after it was first brought to her attention, that a 'report' was issued by Dr. [Joseph] Cillo [ ("Dr.Cillo") ]." Kohn Certif. at ¶ 27. The Defendants, however, assert: "Kohn never specified any accommodations he needed to ensure that he could complete the projects that he was assigned as part of his job responsibilities." Defendants' Rule 56.1 Statement at ¶ 8.

It appears that on or about 25 November 1996, Zaracki forwarded a "Request for Employee Fitness Evaluation" to Health Affairs to have Kohn evaluated for

---

9. The Amended Complaint, like the Kohn Certification and Freedman Certification, is unsworn. As such, it is cited or quoted only for context. As discussed below, the unsworn Amended Complaint does not create any genuine issues of material fact. *See* Fed.R.Civ.P. 56(c)("Rule 56(c)").

10. A copy of the 29 October 1996 Memorandum is attached to the Kohn Certification as Exhibit 4.

his alleged ADD. *See* Zaracki Aff. at ¶ 7.[11] In or about February 1997, Zaracki received a written evaluation from Dr. Cillo (the "Cillo Evaluation"). *See id.; see also* Kohn Certif. at ¶ 27. The Cillo Evaluation, dated 21 February 1997, provided:

> [Kohn] has a medical condition which if optimally managed should not interfere with his ability to perform his job. Recommendations for the workplace include the following: He needs a clear statement about productivity and the outcome expected in a clear set of objectives and milestones. This would certainly involve a formal performance improvement plan with well-understood time-bound goals.
>
> It is hoped that distractions and side issues will not be a problem if the expectation is clear that he focus on what is important to accomplish his job. He must be urged not to dwell on his perceptions of supervisors' feelings or 'office politics,' but focus on the job at hand.

Cillo Evaluation.[12] Zaracki states she discussed the content of the evaluation with Dr. Cillo. Zaracki Aff. at ¶ 7.

Kohn asserts Zaracki failed to follow the instructions provided by Cillo, and instead "utilized [Kohn's] disability to undercut [his] ability to perform." Kohn Certif. at ¶ 18; *see also* Amended Complaint at ¶¶ 45. In this regard, Kohn states Zaracki refused to hold weekly meetings and failed to provide him with "meaningful feedback" or certain documents needed to complete assignments. Kohn Certif. at ¶ 18; Amended Complaint at ¶ 53. Kohn alleges:

> Rather than accomodating [sic] [Kohn's] disability, Ms. Zaracki used that disability to create hostility and division in the workplace against [Kohn] and create

barriers and obstacles to the successful completion of his objectives, in violation of the [ADA].

Amended Complaint at ¶ 49.

4. *Events Culminating in Termination of Kohn*

On or about 24 February 1997, Zaracki again met with Kohn to discuss his deficient performance. *See* Amended Complaint at ¶ 61. Zaracki states that during the meeting, she provided Kohn with a Performance Appraisal for the period spanning from 15 March 1996 through 31 December 1996. Zaracki Aff. at ¶ 8; *see also* Performance Appraisal.[13] The Performance Appraisal observed, *inter alia:*

> [Kohn] successfully developed the WPC proposal for global discounts (IGD) and reviewed it with Members and Partners to gain their input and support. His document on the IGD concept is well constructed and easy to understand.
>
> However, and more importantly, [Kohn] did not effectively manage the IGD concept into a workable plan. As project manager, [Kohn] was responsible for managing the IGD into market trial by 12/96. This required obtaining Member commitment to participate in the trial as well as completion of the Trial Reference Guide documentation, a turn key document which explains the IGD concept, processes, roles/responsibilities and Member job aids associated with IGD. [Kohn] successfully obtained commitment from six Members to participate in the trial. He did not complete the IGD process development and trial documentation in the time frame required. Progress was so slow that the trial start date, which was the WPC President's commitment to the Partners, was in jeopardy. IGD team members repeatedly complained about [Kohn's]

---

11. A copy of the Request for Employee Fitness Evaluation, dated 25 November 1996, is attached to the Zaracki Affidavit as Exhibit G.

12. A copy of the Cillo Evaluation is attached to the Zaracki Affidavit as Exhibit G.

13. A copy of the Performance Appraisal is attached to the Zaracki Affidavit as Exhibit H.

lack of effective project management. As a result, [Kohn] was removed from the project.

[Kohn] did prepare a draft outline of the pricing strategy document. However, it did not have sufficient detail to be meaningful. [Kohn] was notified by his supervisor that the outline was unsatisfactory. No revisions were submitted for review to his supervisor.

. . . . .

While [Kohn] completed [a WS–PL price book and work updating subsequent price books], the work was not completed in a timely manner. Delays in updating the price books prevented Members from quickly pricing initial customer bid requests. The outdated price books generated more work for the Members in pricing bids, thus adding to the bid cycle time and a[sic] creating a source of Member and customer dissatisfaction.

[Kohn] prepared the Offer Management department budget. He did an adequate job, but required assistance from his supervisor to identify errors. In addition, his supervisor determined that [Kohn] was having difficulty effectively managing the IGD Offer Development and price book update projects. This combined with mediocre support of the budgeting process led his supervisor to conclude that [Kohn] would not be effective in leading the revenue forecast project. This critical job responsibility was assigned to another individual. [Kohn's] overall contribution to WPC in the area of business plan support was unsatisfactory.

Performance Appraisal at 1–2.

As a result of the findings in the Performance Appraisal, Kohn received a "Partially Met" performance rating. Zaracki Aff. at ¶ 8. Kohn then was presented with an Election Form, dated 24 February 1997, which gave him option of either (1) being placed on a Performance Improvement Plan (the "PIP"), which provided for the termination of his employment if he failed to improve his employment within sixty days, or (2) being permitted to search for another position full-time for sixty days, after which his employment would be terminated if he did not find another position. *See* Zaracki Aff. at ¶ 9; Election Form.[14] The Election Form further stated: "If employee declines to sign or choose an Option, he/she will be placed on a PIP immediately." Election Form. Because Kohn did not sign the Election Form, he was, by default, placed on the sixty day PIP. *See* Zaracki Aff. at ¶ 9; Amended Complaint at ¶ 37; Kohn Certif. at ¶ 23.

A document entitled "Performance Improvement Plan" (the "PIP Document") was then provided to Kohn. The PIP Document delineated the "skills required for success," "opportunities to demonstrate skills" and various "development benchmarks" to be employed by Kohn in improving both his management and interpersonal skills. *See* PIP Document.[15] The PIP Document also listed the managerial responsibilities of Kohn:

> [Kohn] shall be responsible for carrying out all phases of the pricing and business analysis projects assigned to him. This includes but is not limited to:
>
> - Ongoing Member deployment and certification support
> - FR and PL Price Book updates and distribution to the required individuals
> - Development of pricing strategy document, updates and revisions based on supervisor(s) input
> - Conducting price analysis with recommendations on WorldSource PL
> - Ongoing participation in win/loss review process
> - Develop price structures and supporting documentation for World-

---

14. A copy of the Election Form is attached to the Zaracki Affidavit as Exhibit I.

15. A copy of the PIP Document is attached to the Zaracki Affidavit as Exhibit J.

Source Toll Free Service (Free-phone).

*Id.*

Kohn asserts the objectives set forth in the PIP

were not clearly defined and there were no objectively measurable performance criteria ... Because such 'objectives' were antithetical to the instructions by AT & T's Dr. Cillo, the application of PIP itself constituted a violation of the American with Disabilities Act, for Ms. Zaracki was taking advantage of [his] disability to assist in [his] being fired.

Kohn Certif. at ¶ 24; *see also* Amended Complaint at ¶ 62.

Zaracki states Kohn did not successfully complete the terms of the PIP. Zaracki Aff. at ¶ 11. Zaracki memorialized her findings in a "PIP Results" document, dated 6 May 1997, (the "PIP Results Document") which reflected her assessment of the performance of Kohn as measured against the conditions and objectives set forth in the PIP document. The PIP Results Document stated, *inter alia*, Kohn failed to complete the "Pricing Strategy Document" or conduct "PL Competitive Price Analysis[.]" *See* PIP Results Document.[16] It further observed Kohn "[d]id not take full responsibility for all decisions (i.e. price book)," "constantly attempted to get others to complete his activities (i.e. price book, price strategy document)," and "[d]id not complete activities on time[.]" *Id.*

Kohn does not contest that he failed to meet the requirements of the PIP. *See* Amended Complaint at ¶ 64. He simply states Zaracki had extended the deadlines of various assignments and told him to ignore certain projects. *See* Kohn Certif.

at ¶¶ 31–33.[17] Kohn attributes other failures to vaguely referenced "legal and regulatory problems." *Id.* at ¶ 31; Amended Complaint at ¶¶ 64–66.

Zaracki subsequently recommended Kohn be terminated from his position with WPC, in light of his failure to successfully complete the PIP. Zaracki Aff. at ¶ 11. According to Zaracki, both Leasure and Krieger concurred in and approved her recommendation. *Id.*

On 8 May 1997, Kohn was terminated from his position with WPC. *See* Zaracki Aff. at ¶ 12. By letter, dated 8 May 1997, (the "8 May 1997 Termination Letter") Zaracki informed Kohn he had not met the terms of the PIP and had thirty days within which to find another position within AT & T. *See* 8 May 1997 Termination Letter.[18] Kohn was directed to report immediately to the AT & T Resource Center and to take his personal belongings with him. *Id.*

By letter, dated 30 May 1997, (the "30 May 1997 Extension Letter") Kohn was provided with a thirty-day extension of time within which to utilize the AT & T Resource Center to find another position with AT & T. *See* Zaracki Aff. at ¶ 12; 30 May 1997 Extension Letter.[19] While Kohn searched for another position, Zaracki, Leasure and Krieger agreed to extend him on the AT & T payroll until 20 June 1997. *See* Zaracki Aff. at ¶ 12. It appears, however, Kohn did not obtain another position with AT & T. *See id.* Consequently, Kohn was removed from the AT & T payroll, effective 20 June 1997. *Id.;* Kohn Certif. at ¶ 25.

### 5. *The Instant Complaint*

Following his termination, Kohn filed a complaint with the Equal Employment Op-

---

**16.** A copy of the PIP Results Document is attached to the Zaracki Affidavit as Exhibit K.

**17.** Contrary to these assertions, in the Amended Complaint Kohn alleges Zaracki "set unreasonable and unrealistic schedules[.]" Amended Complaint at ¶ 40.

**18.** A copy of the 8 May 1997 Termination Letter is attached to the Zaracki Affidavit as Exhibit L.

**19.** A copy of the 30 May 1997 Extension Letter is attached to the Zaracki Affidavit as Exhibit M.

portunity Commission (the "EEOC"). Kohn Certif. at ¶ 25. Kohn alleges he received a Right–To–Sue letter from the EEOC on or about 1 September 1998. Amended Complaint at ¶ 18.

As mentioned, Kohn filed the Amended Complaint on 21 January 1999. He alleges, *inter alia*, he was illegally terminated and discriminated against "by reason of his age, his religion and his disabilities," in violation of Title VII, the ADEA and the ADA. Amended Complaint at ¶¶ 1, 5. The Amended Complaint also alleges Zaracki and Leasure engaged in discriminatory conduct, including:

> [Zaracki's] failure to provide [Kohn] with clear objectives and criteria regarding job expectations and reasonable managerial support and providing contradictory direction to [Kohn], her sabotaging [Kohn's] pricing work by directing co-workers of [Kohn] not to cooperate with him and providing misinformation to [Kohn] and his co-workers, her attempt to isolate [Kohn] from his co-workers, her failure to accomodate [sic] [Kohn's] observance of Jewish holy days and dietary requirements, as well as her failure to follow AT & T-required procedures to address alleged deficiencies in his work, which procedures were necessary by virtue of his disabilities as shown by AT & T's own medical evaluation. Before terminating an employee with perceived unsatisfactory performance behavior, these procedures were required by AT & T in devising and following through on a PIP ... which was necessarily to be in writing and followed through by discussion and explanation to the affected employee.
>
> The PIP set up by Ms. Zaracki and Mr. Leasure was set up with the intention of forcing [Kohn] to leave AT & T. The PIP was not used as a tool to help the employee but rather was set up and used as a means to terminate [Kohn].

The alleged plan consisted of vague and obtuse objectives combined with unclear subjective non-measurable performance criteria.

*Id.* at ¶¶ 10–11. As stated, Kohn alleges, "these actions were motivated by discrimination against him by reason of his age, his faith and his disability[.]" *Id.* at ¶ 16.

Zaracki, however, asserts:

> The sole reason for Kohn's termination was his poor work performance. Neither Kohn's age, religion, his ADD, nor any legal issues and/or concerns he may have raised during his assignment to WPC, played any part in this decision, or for that matter any other employment action taken with respect to Kohn.

Zaracki Aff. at ¶ 11.

### B. *Procedural History*

Kohn initially filed a complaint against the Defendants in the Superior Court of New Jersey, Chancery Division, Bergen County (the "Chancery Division Complaint") on 4 June 1998. *See* Chancery Division Complaint. The Chancery Division Complaint alleged violations of CEPA and defamation. By order, dated 27 January 1999, the Chancery Division Complaint was dismissed without prejudice. *See* Stipulation and Order filed with this Court on 22 March 1999, (the "Stipulation and Order").

On or about 24 November 1998, Kohn filed another complaint against the Defendants in the Superior Court of New Jersey, Law Division, Bergen County (the "Superior Court Complaint"). The Superior Court Complaint alleged, *inter alia*, the Defendants maintained a pattern and practice of discrimination against Kohn, in violation of Title VII, the ADEA and the ADA. *See* Superior Court Complaint.[20]

On 8 January 1999, the Defendants timely removed the action to this court. *See* Notice of Removal. On 13 January 1999, the Defendants requested an exten-

---

**20.** The Superior Court Complaint is attached as Exhibit A to the notice of removal (the

"Notice of Removal") filed by the Defendants on 8 January 1999.

sion of time to answer or otherwise move, which request was granted, by order of the Clerk of the Court, dated 13 January 1999, (the "13 January 1999 Clerk's Order"). *See* 13 January 1999 Clerk's Order.

As mentioned, Kohn filed the Amended Complaint on 21 January 1999. *See* Amended Complaint. The Amended Complaint added claims against the Defendants for defamation and violations of CEPA. *See id.* at Counts Two and Three. Pursuant to the Stipulation and Order, the causes of action for defamation and CEPA violations were deemed to have been commenced as of 4 June 1998, the date of the filing of the Chancery Division Complaint. *See* Stipulation and Order.

The Defendants filed an answer (the "Answer") to the Amended Complaint on 10 March 1999. *See* Answer. The Summary Judgment Motion was filed on 7 May 1999.

*Discussion*

A. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Chrysler Corp.,* 163 F.3d 183, 186 (3d Cir.1998); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996); *Witco Corp. v. Beekhuis,* 38 F.3d 682, 686 (3d Cir.1994). Factual disputes may not be resolved on a motion for summary judgment. *See Linan–Faye Constr. Co. v. Housing Auth. of City of Camden,* 49 F.3d 915, 926–27 (3d Cir.1995)("[A]t the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial' ")(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Conti-*

*nental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992).

When considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Seitzinger v. Reading Hosp. & Med. Ctr.,* 165 F.3d 236, 238 (3d Cir.1999)(citing *Gallo v. City of Philadelphia,* 161 F.3d 217, 219 (3d Cir.1998)); *Williams,* 163 F.3d at 186; *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 130–31 (3d Cir.1996); *General Ceramics Inc. v. Firemen's Fund Ins. Cos.,* 66 F.3d 647, 651 (3d Cir.1995); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983)(stating court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

When the resolution of issues depends wholly upon the interpretation of specific statutory language and the applicable law, summary judgment is appropriate. *See DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 724 (3d Cir.), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *see also Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) ("[S]ummary judgment is proper where the facts are undisputed ...."), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985); *Estate of Reddert v. United States,* 925 F.Supp. 261, 265 (D.N.J.1996).

When the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the movant demonstrates an essential element of the nonmovant's case is lacking, the nonmovant must come forward with sufficient evidence to demonstrate there is a factual controversy as to that element. *See Anderson,* 477 U.S. at 247, 106 S.Ct. 2505; *Siegel Transfer, Inc. v. Carrier Ex-*

*press, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir. 1995); *Witco*, 38 F.3d at 686. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts"); *accord Siegel*, 54 F.3d at 1130–31; *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 534 (D.N.J.), *aff'd without op'n*, 899 F.2d 1218 (3d Cir.1990).

If the nonmovant fails to make a sufficient showing regarding an essential element of its case upon which it will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *See Celotex*, 477 U.S. at 321, 106 S.Ct. 2548; *Siegel*, 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993) (stating "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant.").

In a discrimination action, a defendant must establish "the plaintiff will be unable to introduce either direct evidence of discrimination or indirect evidence by showing that the proffered reason for the employment action is subject to factual dispute." *Hankins v. Temple University*, 829 F.2d 437, 440 (3d Cir.1987); *see Weldon v. Kraft*, 896 F.2d 793, 797 (3d Cir. 1990).

Once a motion for summary judgment is made and supported by "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," *see* Fed.R.Civ.P. 56(c),

> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e)("Rule 56(e)"). As noted, to survive a properly supported motion for summary judgment, the nonmovant must "proffer evidence significantly probative of the validity of his [or her] claims." *Padillas*, 1997 WL 597655, at *3 (citing *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505); *see Coolspring Stone Supply*, 10 F.3d at 147; *Bodie*, 682 F.2d at 439; *Jamison*, 536 F.2d at 564. Unsworn declarations not filed under penalty of perjury fail to significantly legitimize claims. *See Small*, 98 F.3d at 765 n. 5 (citing *Adickes*, 398 U.S. at 158 n. 17, 90 S.Ct. 1598); *Pastore*, 24 F.3d at 511; *Radich*, 886 F.2d at 1394; *Branella*, 972 F.Supp. at 300; *Maietta*, 749 F.Supp. at 1362; *Fucci*, 969 F.Supp. at 315 n. 8.

### B. *Framework for Discrimination Claims*

As indicated, Kohn alleges the Defendants discriminated against him on the basis of his religion, age and alleged disabilities in violation of Title VII, the ADEA and the ADA.

■ Employment discrimination claims under Title VII, the ADEA and the ADA may be established either by the presentation of direct evidence of discrimination, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir.1994), or from evidence which creates an inference of discrimination. *See United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Torre*, 42 F.3d at 829; *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 153 (7th Cir.), *cert. denied*, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994); *Harel v. Rutgers, The State University*, 5 F.Supp.2d 246, 263 (D.N.J.1998). "Direct evidence of

discrimination would be evidence which, if believed, would prove the existence of the fact in issue *without inference or presumption.*" *Torre,* 42 F.3d at 829 (emphasis in original; citations and internal punctuation omitted). Evidence is not direct "where the trier of fact must *infer* the discrimination ... from an employer's remarks." *Id.* (emphasis in original; citation omitted).

■ Where a plaintiff has not presented direct evidence of discrimination, employment discrimination claims are construed pursuant to the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and clarified in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Harel,* 5 F.Supp.2d at 263. In *McDonnell Douglas* and *Burdine,* the Supreme Court articulated a four-part framework for evaluating claims of unlawful discrimination under Title VII.[21]

Under the *McDonnell Douglas/Burdine* framework, a discharged employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). To establish a *prima facie* case of disparate treatment discrimination, Kohn must prove by a preponderance of the evidence (1) he belongs to a protected class, (2) he was qualified for the Manager of Pricing and Business Analysis position with WPC and was performing at a level which met the legitimate expectations of WPC, (3) he was not retained in the position, despite being qualified and (4) he ultimately was replaced by someone not in the protected class, permit-

ting an inference of discrimination. *See Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Smith v. Borough of Wilkinsburg,* 147 F.3d 272, 278 (3d Cir.1998); *Simpson,* 142 F.3d at 643–44 & n. 5; *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 342 (3d Cir.1990); *Lawrence v. Nat'l Westminster Bank of N.J.,* 98 F.3d 61, 65–66 (3d Cir.1996); *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 (3d Cir. 1995); *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995); *Billet v. CIGNA Corp.,* 940 F.2d 812, 816 n. 3 (3d Cir.1991)(citing *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 792 (3d Cir.), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

Once established, a *prima facie* case creates a presumption of discriminatory intent by the defendant-employer. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. While the ultimate burden of persuasion remains with the plaintiff, *see Smith,* 147 F.3d at 278, the burden of production shifts to the defendant-employer who must articulate a legitimate, nondiscriminatory justification for terminating the employee. *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Lawrence,* 98 F.3d at 66. "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450

---

**21.** As discussed below, the burden-shifting scheme established by the Supreme Court in *McDonnell Douglas* applies not only to actions brought pursuant to Title VII, *see Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994), but also to claims brought under the ADEA, *see O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 (3d

Cir.1998), and the ADA. *See Walton v. Mental Health Ass'n of Southeastern Pa.,* 168 F.3d 661, 666 (3d Cir.1999)(quoting *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 157 (3d Cir.1995)); *Olson v. General Electric Astrospace,* 101 F.3d 947, 951 (3d Cir.1996)(citing *Newman,* 60 F.3d at 157); *Owen v. Computer Sciences Corp.,* No. 97–6272, 1999 WL 43642, at *3 n. 6 (D.N.J. Feb. 2, 1999).

U.S. at 255, 101 S.Ct. 1089. At this stage, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Id.* at 260, 101 S.Ct. 1089 (rejecting lower court decision holding defendant to a preponderance of the evidence standard). Once the employer satisfies this burden, the presumption raised by the *prima facie* case is "rebutted" and "drops from the case." *Id.* at 255 & n. 10, 101 S.Ct. 1089; *see Hicks,* 509 U.S. at 507, 113 S.Ct. 2742.

A plaintiff-employee must then prove by a preponderance of the evidence the legitimate reasons proffered by the employer "were not its true reasons, but were a pretext for discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Torre,* 42 F.3d at 829; *Fuentes,* 32 F.3d at 763; *Owen,* 1999 WL 43642, at *3 n. 6. Concerning the "pretext" stage of the *McDonnell Douglas/Burdine* analysis, this Circuit has stated:

> To discredit the employer's proffered reason [for discharging an employee], ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the ... plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'

*Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995)(quoting *Fuentes,* 32 F.3d at 765)(emphasis in original)(internal citations omitted); *see*

*Waldron,* 56 F.3d at 495 (rejecting the "pretext-plus" standard under which a plaintiff would have to show defendant-employer's reasons were false *and* the real reason for the employment action was discriminatory).

To survive summary judgment when an employer has articulated a legitimate, non-discriminatory reason for its actions,

> the plaintiff must point to evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Simpson,* 142 F.3d at 644 (quoting *Fuentes,* 32 F.3d at 764); *see Lawrence,* 98 F.3d at 66; *Sempier,* 45 F.3d at 731.

Once the plaintiff points to evidence sufficient to discredit the proffered reasons of the defendant-employer, the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case to overcome a summary judgment motion by the defendant. *Brewer,* 72 F.3d at 331; *Waldron,* 56 F.3d at 495.

In this instance, Kohn has not presented, nor does he allege there is any direct evidence of age, religious or disability discrimination. Accordingly, his claims are analyzed pursuant to the *McDonnell Douglas/Burdine* framework. *See Harel,* 5 F.Supp.2d at 263. As discussed below, Kohn has offered no evidence, or even explanation to show the actions taken by AT & T and WPC[22] were *prima facie* discriminatory. However, assuming, *arguendo,* Kohn has stated a *prima facie* case of discrimination, he has not adduced facts indicating the proffered reasons for his termination were pretextual. Material facts relating to the Title VII, ADEA and

---

**22.** The discrimination claims against Zaracki and Leasure in their individual capacities are addressed in Part C, *infra.*

ADA claims of Kohn are not in dispute; AT & T and WPC, therefore, are entitled to judgment as a matter of law on those claims. The claims of Kohn against his employer are addressed seriatim.

### 1. *Title VII*

As stated, Kohn alleges WPC and AT & T discriminated against him in part because he was Jewish. *See* Amended Complaint at ¶ 14. The Amended Complaint does not set forth specific examples of religious discrimination. It alleges only that Kohn is Jewish, *see* Amended Complaint at 5, and that he was prevented from taking vacation during Christmas time because he already took vacation time during the Jewish Holy Days.[23] *See id.* at ¶ 56.

The Kohn Certification similarly omits mention of specific instances of religious discrimination. Kohn simply states he received the PIP Results Document, which was "full of erroneous information," after he returned from vacation for Passover. *See* Kohn Certif. at ¶¶ 8, 9. Kohn also states he is an ordained rabbi and discussed with Zaracki that he could not work on the Jewish Holy Days or on the Sabbath. *See id.* at ¶ 12. According to Kohn, Zaracki later falsely testified at her deposition that she did not know he was an observant Jew. *See id.* at ¶¶ 11–14.

Title VII provides, in pertinent part:

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a). In enacting Title VII, Congress sought to "assure equality of employment opportunities and ... elim-

inate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas*, 411 U.S. at 800, 93 S.Ct. 1817 (citing, *inter alia*, *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Congress, however, did not intend Title VII

'to guarantee a job to every person regardless of qualifications .... Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classifications.'

*Id.* at 800–01, 93 S.Ct. 1817 (quoting *Griggs*, 401 U.S. at 430–31, 91 S.Ct. 849).

As discussed, claims of unlawful discrimination under Title VII must be evaluated pursuant to the *McDonnell Douglas/Burdine* burden-shifting scheme. Before the burden of production shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff-employee, the plaintiff bears the burden of establishing a *prima facie* case of discrimination under Title VII. *See Hicks*, 509 U.S. at 506, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

As explained below, it appears Kohn has not stated a *prima facie* case of discrimination under Title VII. Consequently, WPC and AT & T need not come forward with a legitimate, nondiscriminatory reason for terminating his employment. *See Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 174 (3d Cir.1988)("Where the plaintiff is unable to establish a *prima facie* case, no inference of discrimination is raised and defendants have no burden to

---

**23.** As mentioned, the Amended Complaint is unsworn. It therefore has no value in relation to opposing the Summary Judgment Mo-

tion and sworn statements of the Defendants. *See* Fed.R.Civ.P. 56(c).

proffer a reason for its action."). Nevertheless, as discussed below, the repeated failures of Kohn to remedy his performance deficiencies provide sufficient, non-pretextual justification for his termination under Title VII.

■ Preliminarily, the Defendants do not contest Kohn, a member of the Jewish faith, is part of a "protected class." *See* Moving Brief at 12 n. 6. The Defendants instead focus on the second element of the *prima facie* case, arguing:

Kohn failed to improve his unsatisfactory work performance, despite being repeatedly advised that he needed to do so .... [I]t is clear that Kohn was not performing his job duties 'at a level that met the employer's legitimate expectations[.]'

*Id.* at 13 (quoting *Turner*, 901 F.2d at 342).

Kohn admits he failed to perform various tasks assigned to him, and offers excuses for his failure to do so. In this regard, he states the "questionable legality" of negotiating an IGD and compiling prices precluded his timely completion of these tasks or of the PIP. *See* Kohn Certif. at ¶ 4. Kohn, however, refused to complete these assignments even after WPC and AT & T assured him there would be no attendant legal implications. *See id.* at ¶ 16 (citing 29 October 1996 Memorandum). The 29 October 1996 Memorandum from Zaracki to Kohn stated, in pertinent part:

We have already discussed the legal issue that you raise. There isn't one. If a meeting is required [to discuss Kohn's allegations of illegality], then you better set it up. Regardless of the outcome or scheduling conflicts, the due date for completion of this project is still the same.

Sam, this project has been clearly identified in your objectives since April. You have had plenty of time to work the issues associated with the project. The deliverables are overdue and this project is not yet completed. The due date for completion of this project is 11/22. I would strongly recommend that you focus your energies on completing this work per my instructions instead of creating new blocking issues and asking me to make your decisions for you.

29 October 1996 Memorandum.

Kohn offers other excuses as well, asserting, among other things, Zaracki had extended the deadline for the price analysis beyond the dates set forth in the PIP. *See* Kohn Certif. at ¶ 32. The PIP Results Document submitted by the Defendants indicates the original deadline for completing the price analysis was extended by ten days. *See* PIP Results Document. The PIP Results Document also reveals that Kohn failed to meet this extended deadline as well. *See id.* Significantly, Kohn does not dispute he missed the extended deadline for completing the price analysis.

In contrast to the weak excuses offered by Kohn, the Defendants submitted several documents indicating Kohn was not performing his job duties at an acceptable level, despite ample guidance and feedback from his supervisors. It appears Zaracki provided Kohn with the Career Plan Summary, the Coaching/Feedback Document, the Development Plan, the Illustrative Examples Document and the Performance Appraisal all well in advance of his termination in May 1997. It appears all of these documents clearly delineated the tasks required of Kohn and set forth guidelines for appropriate office behavior. It further appears Zaracki informed Kohn in August 1996, and again in the October 1996 Feedback Session, that his interpersonal and job-related skills needed to improve. Finally, it appears from the PIP Document and PIP Results Document that Kohn was again made aware of the tasks and skills needed to avoid termination, but failed to successfully complete meet most of the tasks or conform his behavior accordingly. *See* PIP Document; PIP Results Document.

■ Kohn fails to proffer any credible evidence indicating his performance was at

a level which met the legitimate expectations of WPC or AT & T. In opposition to the Summary Judgment Motion, he argues:

> [W]e submit, the credible evidence will show that [Kohn] was performing his job properly, and that he was fired because of the discrimination against him . . . .

Opposition Brief at 3. Mere reliance of conclusory arguments will not establish a genuine issue of material fact. *See Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990); *Cigarrera La Moderna v. Inventory Mgmt. Consultant Group, Ltd.*, No. 95–1788, 1998 WL 419460, at *3 (D.N.J. July 20, 1998).

In further opposition to summary judgment, counsel for Kohn states the case "will turn on the credibility of Kamie Zaracki versus that of [Kohn]." Freedman Certif. at ¶ 3; *see also* Opposition Brief at 2. In light of the documents proffered by the Defendants which support the statements of Zaracki, there is no genuine issue of material fact as to the credibility of Zaracki concerning Kohn's job performance. As stated, Kohn concedes he was not performing various job assignments. In addition, that Zaracki may have been aware Kohn is Jewish, as Kohn asserts, is irrelevant absent any credible evidence of discriminatory animus.

■ Because Kohn has not met his burden of establishing a *prima facie* case of religious discrimination, the Defendants need not articulate a legitimate, nondiscriminatory reason for terminating his employment. *See Hicks*, 509 U.S. at 507, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Lawrence*, 98 F.3d at 66; *Spangle*, 839 F.2d at 174. As explained, however, the Defendants have nevertheless articulated legitimate, nondiscriminatory reasons for terminating Kohn, namely, his repeated failures to remedy the deficiencies in his work performance and, ultimately, his failure to meet the terms of the PIP. As discussed, Zaracki repeatedly alerted Kohn to problems with his job performance and advised him he needed to improve his job-related skills. Despite denials by Kohn that such problems existed, the submissions of the Defendants reveal the problems were well-documented.

As discussed, to survive a summary judgment motion, Kohn must come forward with facts or inferences logically flowing from such facts which discredit the proffered legitimate, nondiscriminatory reasons of WPC and AT & T for his termination. *See Simpson*, 142 F.3d at 644; *Lawrence*, 98 F.3d at 66; *Sempier*, 45 F.3d at 731. Kohn, however, simply argues in conclusory fashion: "On this summary judgment motion, we submit that [Kohn] has established, as the minimum, that the stated reason [for his termination] is a pretext. The motion should be denied." Opposition Brief at 3. Critically, Kohn points to no evidence, direct or circumstantial, suggesting the legitimate, nondiscriminatory reasons proffered by the Defendants are a pretext for religious discrimination.

It appears, moreover, Kohn was not terminated until repeated efforts by the Defendants to remedy his performance deficiencies proved unfruitful. The Defendants gave Kohn ample opportunity to improve his work performance. In any event, whether the decision of WPC to fire Kohn was prudent or wise is irrelevant; Kohn must offer evidence, direct or circumstantial, to demonstrate the decision was "weak, implausible, contradictory, or coherent" or that discriminatory animus was the likely impetus for the decision. *See Silvestre v. Bell Atlantic Corp.*, 973 F.Supp. 475, 483 (D.N.J.)(quoting *Fuentes*, 32 F.3d at 765), *aff'd*, 156 F.3d 1225 (3d Cir.1998).

Although the evidence must be viewed in the light most favorable to Kohn, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, Kohn has not submitted any evi-

dence, under oath or otherwise, to demonstrate religious discrimination. The unsupported, conclusory allegations of Kohn do not create a genuine issue of material fact. *See Schoch,* 912 F.2d at 657. Accordingly, summary judgment is granted in favor of AT & T and WPC as to the Title VII claims of Kohn.

## 2. *The ADEA*

Kohn additionally alleges he was terminated in violation of the ADEA. In support of this claim, Kohn alleges a single fact: he is fifty-two years old. *See* Amended Complaint at ¶ 3.

▮ The ADEA was enacted in 1967 "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The ADEA is intended to further the dual goals of compensating victims of discrimination and deterring employers from discriminating against older workers. *Long v. Sears Roebuck & Co.,* 105 F.3d 1529, 1541 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1033, 140 L.Ed.2d 100 (1998). The ADEA makes it illegal for employers to refuse to hire, to fire or to discriminate against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1)("Section 623").[24] A cause of action under the ADEA is limited to plaintiffs who are at least forty years of age. 29 U.S.C. § 631.

▮ To recover in an age discrimination suit, a plaintiff must prove, by a preponderance of the evidence, age was a determinative factor in the employment decision at issue. *Billet,* 940 F.2d at 816; *Bartek v. Urban Redevelopment Auth. of Pittsburgh,* 882 F.2d 739, 742 (3d Cir.1989). A plaintiff, however, is not required to prove "that age was the sole or exclusive reason, but rather that 'age made a difference' in the employer's decision." *Billet,* 940 F.2d at 816 (citation omitted).

As discussed, age discrimination claims are governed by the burden shifting analysis enunciated in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, refined in *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089 and clarified in *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *Simpson,* 142 F.3d at 643 (citing *Sempier,* 45 F.3d at 728); *Johnson v. Penske Truck Leasing Co.,* 949 F.Supp. 1153, 1170–71 (D.N.J. 1996). Kohn has not come forward with any evidence, direct or circumstantial, to support his claims of age discrimination; a careful review of the submissions, moreover, reveals no such evidence.

To establish a *prima facie* case of age discrimination, Kohn must establish (1) he is forty years of age or older and therefore belongs to a protected class, (2) he was qualified for the position from which he was discharged, (3) he was dismissed notwithstanding his qualifications and (4) he was replaced by an individual sufficiently younger to permit an inference of discrimination. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994)(citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 and *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817).

▮ It is undisputed Kohn falls within the protected age group under the ADEA.

---

**24.** Section 623 provides in pertinent part:

It shall be unlawful for an employer-
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, condition, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his [or her] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his [or her] status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply with this chapter.
29 U.S.C. § 623(a).

*See* Moving Brief at 12 n. 6. As discussed in conjunction with his Title VII claim, however, Kohn has not even alleged facts indicating he was dismissed by WPC because of his age, despite being qualified. *See* Amended Complaint. The Amended Complaint is devoid of any specific examples of age discrimination; it merely alleges Kohn is fifty-two years old. *See id.* at ¶ 3.

Kohn also has not indicated in any of his submissions that he was replaced by an individual sufficiently younger, permitting an inference of discrimination. The Opposition Brief and the Kohn Certification do not even mention age or any facts hinting at age discrimination. *See* Opposition Brief. That Kohn is fifty-two years old does not create a genuine issue of material fact. As discussed, mere conclusory allegations of age discrimination are insufficient to survive a properly supported motion for summary judgment. *See Maguire,* 912 F.2d at 72; *Schoch,* 912 F.2d at 657. Because Kohn has not stated a *prima facie* case of age discrimination, much more demonstrated the legitimate, nondiscriminatory reasons for his termination were pretextual, the ADEA claim against WPC and AT & T is dismissed.

### 3. *ADD as a Disability Under the ADA*

As indicated, Kohn also alleges WPC and AT & T violated the ADA by discriminating against him by virtue of his ADD. Specifically, Kohn alleges WPC and AT & T were aware Kohn suffered from ADD, but nevertheless failed to provide him with clear objectives and criteria concerning their job expectations for him. *See* Amended Complaint at ¶ 10.

The ADA proscribes "discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment."

42 U.S.C. § 12112(a). The term "qualified individual with a disability" refers to a person who, with or without "reasonable accommodation," can perform the essential functions of the employment position that person holds or seeks. 42 U.S.C. § 12111(8).

The *McDonnell Douglas/Burdine* framework described above also applies to the analysis of suits brought under the ADA. *See Walton,* 168 F.3d at 666; *Olson,* 101 F.3d at 951 (citing *Newman,* 60 F.3d at 157). Accordingly, Kohn bears the burden of establishing a *prima facie* case of unlawful disability discrimination. *See id.*

To establish a *prima facie* case of disability discrimination under the ADA, Kohn must prove by a preponderance of the evidence that (1) he belongs to a protected class under the ADA, (2) he was otherwise qualified to perform the essential functions of the position, (3) he was dismissed despite being qualified and (4) he was ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination. *See Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3d Cir.1998)(citing *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996)); *Olson,* 101 F.3d at 952; *Lawrence,* 98 F.3d at 68; *Sempier,* 45 F.3d at 728; *Chipollini,* 814 F.2d at 897; *Owen,* 1999 WL 43642, at *4.

At issue in the instant case is whether Kohn falls within the protected class. Resolution of this issue depends on whether the ADD of which Kohn claims to suffer is a "disability" under the ADA. *See Gaul,* 134 F.3d at 580; *Olson,* 101 F.3d at 952.

The ADA defines "disability" to mean:

(A) a physical or mental *impairment that substantially limits one or more of the major life activities* of ... [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

42 U.S.C. § 12101(2)("Section 12101(2)")(emphasis added). Major life activities include activities such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630(I). To be considered "substantially limit[ed]" in a major life activity, a plaintiff must be significantly restricted in the performance of the activity, compared to the average person. 29 C.F.R. § 1630.2(j).

Because Kohn has not alleged he has a record of an impairment or that he was regarded as having an impairment, *see* 42 U.S.C. § 12101(2)(B) and (C), he therefore must proffer evidence indicating (1) he suffers from a physical or mental impairment (2) which limits a major life activity (3) *to a substantial degree. See* 42 U.S.C. § 12101(2)(A)(emphasis added); *see also Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 155 (1st Cir.1998).

This Circuit has not squarely addressed whether ADD or the related condition, Attention Deficit–Hyperactivity Disorder ("ADHD"), qualifies as an impairment within the meaning of Section 12101(2).[25] Most courts which have addressed this issue have concluded that ADD and ADHD qualify as mental impairments under the ADA. *See DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 89 (N.D.N.Y.1999)(citing *Bercovitch,* 133 F.3d at 155); *Axelrod v. Phillips Academy, Andover,* 46 F.Supp.2d 72, 82 (D.Mass. 1999); *Bingham v. Oregon School Activities Ass'n,* 37 F.Supp.2d 1189, 1195 (D.Or. 1999); *cf. Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 505–06 (7th Cir.1998). In so finding, it has been observed:

Although the relevant regulations do not specifically list ADHD as an included physical or mental impairment, the list is not exhaustive and includes '[a]ny mental or psychological disorder such as mental retardation ... emotional or mental illness, and specific learning disabilities ....' ADHD is not a learning disability per se.

It is listed as a 'mental disorder' in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM–IV).

*Bercovitch,* 133 F.3d at 155 n. 18 (quoting 28 C.F.R. § 36.104); *see DeMar,* 49 F.Supp.2d at 89.

Whether ADD constitutes a mental impairment within the meaning of the statute is not dispositive of whether ADD is a disability under the ADA, however. "The ADA does not consider every impaired person to be disabled as defined under the statute." *DeMar,* 49 F.Supp.2d at 89. As stated, the ADD must also "substantially limit" a major life activity. *See* 42 U.S.C. § 12101(2)(A).

A person is "substantially limited" in a major life activity when he or she is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or [is] (ii) Significantly restricted as to the condition, manner or duration under which [he or she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

---

**25.** In *Menkowitz v. Pottstown Memorial Medical Center,* 154 F.3d 113 (3d Cir.1998), this Circuit held that a plaintiff physician who was diagnosed with ADD was "disabled" within the meaning of the ADA. The court, however, did not analyze whether ADD was a recognized impairment under the ADA. It stated only: "[T]he parties do not dispute on appeal that appellant is 'disabled' as that term is defined in the ADA. The [defendant] hospital in its brief to this court invites us to affirm the district court's dismissal of appellant's [ADA] claim on the ground that he is not disabled within the meaning of 42 U.S.C. § 12102(2) .... [W]e decline to accept the hospital's invitation at this stage of the litigation." 154 F.3d at 117 & n. 2.

At least one district court in this Circuit has recognized that ADD can constitute a "disability" under Section 12102(2). *See DiBenedetto v. City of Reading,* No. 96–cv–5055, 1998 WL 474145, at *14 (E.D.Pa. July 16, 1998).

29 C.F.R. § 1630.3(j)(1). Where the major life activity involved is working, an individual is substantially limited if he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* § 1630(j)(3)(i). The effects of ADD on a claimant, therefore, must be measured in relation to the performance of an average person having comparable training, skills and abilities. *See Bercovitch,* 133 F.3d at 155–56; *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 n. 12 (7th Cir.1995); *Price v. Nat'l Bd. of Medical Examiners,* 966 F.Supp. 419, 427 (S.D.W.Va.1997)(adopting the "comparison to most people" approach when evaluating whether ADD is a disability under the ADA).

Impairments which merely affect major life activities must be distinguished from impairments which substantially limit major life activities. *DeMar,* 49 F.Supp.2d at 89 (citing *Ryan v. Grae & Rybicki,* 135 F.3d 867, 869–70 (2d Cir.1998)); *see Knapp v. Northwestern University,* 101 F.3d 473, 481 (7th Cir.)("Not every impairment that affects an individual's major life activities is a substantially limiting impair-

ment."), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997). "[T]he impairment must be significant, and not merely trivial." *Reeves v. Johnson Controls World Servs. Inc.,* 140 F.3d 144, 151 (2d Cir.1998)(quoting *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 898 (10th Cir. 1997)); *Davidson,* 133 F.3d at 505–06; *Price,* 966 F.Supp. at 424.

The Defendants, citing *Davidson,* 133 F.3d 499 (7th Cir.1998) and *Jones v. Men's Wearhouse,* No. 97–1891, 1999 WL 134210 (N.D.Tx. Mar. 10, 1999),[26] argue: "Kohn may suffer from ADD; however, Kohn's ADD is not a disability under the ADA because there is no evidence that he is unable to perform or is significantly restricted in his performance of a major life activity." Moving Brief at 19.

Kohn, by contrast, argues in his Opposition Brief:

Defendant's [sic] ... claim that [ADD] is not a disability under the [ADA], citing the *Davidson* case. But that case ruled that there *was* sufficient evidence to permit the factfinder there to conclude that the impairment substantially limited plaintiff's abilities and qualified

---

**26.** *Davidson* involved a disability discrimination claim against an employer brought pursuant to the ADA by an employee who suffered from ADD. The Seventh Circuit affirmed, in relevant part, the decision of the district court which granted summary judgment to the defendant employer "for lack of evidence that [the plaintiff employee] presently has a substantially limiting impairment resulting from ADD ...." 133 F.3d at 502. Specifically, the court found that ADD did not prevent the plaintiff from engaging in the major life activity of working. *Id.* Recognizing ADD qualifies as an impairment under the ADA, *see id.* at 505, it nevertheless was observed:

To demonstrate a significant limitation on her ability to work, it is not enough for the plaintiff to show that her impairment prevented [her] from performing one narrow job for one employer .... At most, the evidence in this case suggests as a result of ADD, [the plaintiff] was unable to perform her job at [defendant-employer]. [The plaintiff] has come forward with no evi-

dence from which one might reasonably infer that ADD precluded her even from holding other comparable positions ....
*Id.* at 506. The court further stated that "[i]n the face of [defendant's] motion for summary judgment, [the plaintiff] needed to identify what requirements posed by the class of ... jobs (or alternatively, by a broad range of other jobs) were problematic in light of the limitations that ADD imposed on her." *Id.* at 507.

Similarly, in *Jones,* 1999 WL 134210, the district court for the Northern District of Texas granted the summary judgment motion by the defendant employer, holding the plaintiff may have suffered from ADD, but was not "disabled" under the ADA. *Id.* at *3. It was concluded: "[The plaintiff's] ADD is not a disability under the ADA because the record does not show that [the plaintiff] is unable to perform or is significantly restricted as to the condition, manner, or duration under which [the plaintiff] can perform a particular major life activity." *Id.*

as a person with a disability for purposes of the ADA.

Curiously, [D]efendants also cite the *Jones* case, although in that case the Court rule first that Jones' discharge claim was barred for failure to exhaust his administrative remedies and Jones submitted no medical or expert testimony supporting his ADD claim.

Here, defendant's [sic] own doctor [Cillo] admitted [Kohn] suffered from a medical condition that required he be treated in a particular manner, which [Kohn] has shown was not followed by Ms. Zaracki. Moreover, [Kohn] has submitted a report from the physician who had been treating him for ADD. Defendants have submitted nothing factual proving that [Kohn] did not suffer from ADD; to the contrary, defendant Zaracki's action have shown her failure to accomodate [sic] [Kohn's] medical condition, as part of her scheme to fire [Kohn].

Opposition Brief at 4. Kohn also submitted a report prepared by Dr. Michael R. Milano, M.D., dated 25 March 1999, (the "Milano Report"). The Milano Report states, in relevant part:

Mr. Samuel Kohn ... is a 54 year old man who was first seen by me in conjoint psychotherapy with his now ex-wife in 1981 .... During that period and for several years after, Mr. Kohn engaged in weekly psychotherapy which focused largely on the need to comprehend the problems which he had brought to the marriage and to develop new relationship patterns with his children and others in his personal life .... During this time, difficulties in work adaptations were not prominent concerns.

Psychotherapy might have concluded with the resolutions of some of these issues when the focus of therapy shifted to several new areas ... [F]or the first time, employment issues became paramount in his therapy. From 1995 through his employment termination in 1998 we intensified the focus on Mr. Kohn's Adult Type Attention Deficit Disturbance.

.    .    .    .    .

Mr. Kohn's degree of impairment varied from modestly severe ... to mild .... It was apparent long before this that Mr. Kohn had lifelong ADD and part of earlier psychotherapeutic work had dealt with the impact on his social life .... He is currently benefiting [sic] from Paxil 20 mg per day.

Throughout 1998, Mr. Kohn was profoundly concerned with the job problems that ultimately led to his termination. We discussed and tried to implement behavioral modifications that would optimize his performance. I had one lengthy phone conversation with Dr. Cillo where we reviewed some specific recommendations, such as: Try to make instructions clear and unambiguous. Help Mr. Kohn to be more directed and terse in his communication. Ignore a degree of messiness and non corporate dress that were minor manifestation. Be patient in clarifying issues of misunderstanding. Finally, ADD can be both a liability and an asset, and look for creative contributions.

From mid 1997 on, work related issues have dominated the therapy. Mr. Kohn has worked to minimize the psychological damage from his termination and to continue to improve his functioning as an individual despite major cardiac surgery and the stresses he has described relating to work. When he completes his cardiac rehabilitation I would see him highly qualified for the work he has done.

Milano Report.[27]

Viewing the facts in a light most favorable to Kohn, it nevertheless appears Kohn does not suffer from a "disability" within the meaning of the statute. Specifically, Kohn has not adduced facts indicating he

---

**27.** A copy of the Milano Report is attached to the Kohn Certification as Exhibit 6.

was substantially limited in performing a major life activity, namely, his job duties and responsibilities.

Contrary to the conclusory assertions of Kohn, the condition of ADD, in itself, does not create a genuine issue of material fact as to whether Kohn is "disabled" under the ADA. *See Davidson,* 133 F.3d at 506; *Jones,* 1999 WL 134210, at *3; *DeMar,* 1999 WL 34973, at *6. Critically, Kohn has not offered evidence comparing his ability to work with that of the average person. *See* 29 C.F.R. § 1630(j); *see also DeMar,* 1999 WL 34973, at *6 ("Notably absent from Plaintiff's allegations are specific facts or evidence demonstrating that Plaintiff is substantially limited in his ability to concentrate [or work by virtue of ADD] in comparison to the general population . . . . [N]either 'conclusory statements, conjecture, [n]or speculation' suffices to defeat summary judgment."); *Davidson,* 133 F.3d at 506. That the "Defendants have submitted nothing factual proving that [Kohn] did not suffer from ADD[,]" Opposition Brief at 4, is irrelevant absent proof the ADD was substantially limiting as compared with the average person having comparable training, skills and abilities.

Kohn also has not identified which of his job requirements were rendered significantly more difficult because of the unarticulated limitations alleged to have been imposed on him by virtue of having ADD. *See Davidson,* 133 F.3d at 507 ("In the face of [Defendant's] motion for summary judgment, [plaintiff] needed to identify what requirements posed by the class of . . . jobs (or, alternatively, by a broad range of other jobs) were problematic in light of the limitations that ADD imposed upon her.").[28] Kohn has not demonstrated his ADD precluded him from performing specific duties as Manager of Pricing and Business Analysis or from holding other comparable positions.

The Milano Report also does not establish Kohn is significantly restricted in his ability to perform as Manager of Pricing and Business Analysis or a class of jobs, as compared to the average person having comparable training, skills and abilities. *See* 29 C.F.R. § 1630(j). It states only that Kohn suffers from ADD, which, as discussed, is insufficient absent proof of substantial limitations on his job performance. Consequently, Kohn has not adduced facts evidencing an inability to perform or any significant restrictions as to the condition, manner, or duration under which he can work. *See Jones,* 1999 WL 134210, at *3 (holding plaintiff's ADD did not substantially limit him, where plaintiff did not offer evidence indicating he was unable to perform or was significantly restricted in any way).

Because Kohn has not demonstrated he is disabled within the meaning of the ADA, WPC and AT & T need not demonstrate they provided Kohn with reasonable accommodations. Pursuant to 42 U.S.C. § 12112(b), discrimination includes:

[N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual *with a disability* who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer].

42 U.S.C. § 12112(b)(5)(A) (emphasis added); *see Walton,* 168 F.3d at 670; *see also* 29 C.F.R. § 1630.9 ("[I]t is the responsibility of the individual *with a disability* to

---

**28.** Curiously, Kohn attempts to distinguish *Davidson* on the grounds that in that case, the Seventh Circuit deemed the plaintiff disabled. There, the court only denied summary judgment as to the secondary issue of whether the plaintiff had produced enough evidence permitting a factfinder to reasonably conclude she had a history of an impairment substantially limiting her ability to *learn. See* 133 F.3d at 507. As stated, however, the court also concluded the plaintiff, who had ADD, was *not* substantially limited in the major life activity of *working. See id.* at 506–07. As discussed, Kohn does not provide facts sufficient to compel a different conclusion.

inform the employer that an accommodation is needed.") (Emphasis added).

In any event, it appears WPC and AT & T provided Kohn with clear objectives and criteria concerning job expectations as early as October 1996. As discussed, in February 1997, Dr. Cillo recommended Kohn be given "a clear statement about productivity and the outcome expected; a clear set of objectives and milestones. This would certainly involve a formal performance improvement plan with well-understood time-bound goals." Cillo Evaluation. Following these recommendations, Zaracki provided Kohn the PIP Document, which clearly set forth objectives and milestones. *See* PIP Document. Specifically, the PIP Document delineated, among other things, the following "developmental benchmarks" and "deliverables" to which Kohn should have adhered:

DEVELOPMENT BENCHMARKS

- Complete project deliverables on time
- Work review process into the planning timeline
- Develop/use written project plan with milestones, DD, individual responsible as mechanism to communicate project progress
- Written meeting minutes with deliverables noted and distributed to team members
- Take initiative to work objectives and find solutions to blocking issues, proactively reviews with supervisor
- Proactive follow-up with others to ensure project deliverables met
- Take initiative to find 'parallel examples' to use as models in developing outputs

. . . . .

DELIVERABLES

1. Continue on-going deployment support of:
- Alestra
- CAT
- Indosat
- Telecom Malaysia

- AT & T Canada

This includes but is not limited to providing pricing tutorials as needed, responding to ad hoc price questions, proofing Member input to FR and PL price books to ensure quality.

2. Complete Price Book update process for FR and PL by 4/1/97 . . . .

3. Participate in Ongoing Win/Loss Reviews This includes successful completion of any work items resulting from the process. [Kohn] should provide courtesy copies of his responses to work assignments from these meetings to his supervisor.

4. Complete Development Of The WorldSource[SM] Services Pricing Strategy document by 4/20/97 . . . .

5. Complete Competitive Price Analysis including appropriate Member recommendations on WorldSource[SM] PL by 4/20/97 . . . .

6. Develop suggested price structure for WorldSource Toll Free Service by 4/20/97.

*Id.* The PIP Document additionally listed skills Kohn needed to master to be a successful Manager of Pricing and Business Analysis:

- Good organizing and planning skills of self, others, projects
- Sets clear direction for self and others consistent with job objectives
- Plans in advance—both for primary output and contingency plans
- Makes timely decisions appropriate to team and job scope
- Helps others achieve their goals and objectives
- Demonstrates interpersonal flexibility
- Moves concepts from theory to practical application and outputs
- Demonstrates support of management direction and priorities

*Id.* The PIP Document also listed the managerial responsibilities of Kohn:

[Kohn] shall be responsible for carrying out all phases of the pricing and business analysis projects assigned to him. This includes but is not limited to:

- Ongoing Member deployment and certification support
- FR and PL Price Book updates and distribution to the required individuals
- Development of pricing strategy document, updates and revisions based on supervisor(s) input
- Conducting price analysis with recommendations on WorldSource PL
- Ongoing participation in win/loss review process
- Develop price structures and supporting documentation for WorldSource Toll Free Service (Freephone).

*Id.*

The conclusory allegations of Kohn that the PIP objectives "were not clearly defined," Kohn Certif. at ¶ 23 and "were very general, confusing and not objectively and specifically measurable," Amended Complaint at ¶ 62, are unpersuasive in light of the straightforward criteria set forth in the PIP Document.

It appears, moreover, Kohn never requested any specific accommodations. *See* 29 C.F.R. § 1630; *see also Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 437 (6th Cir.1998)("[T]he [Defendant] was not obligated to provide accommodation until plaintiff had provided a proper diagnosis of ADHD and requested a specific accommodation."). Zaracki testified that Kohn never provided his supervisors with any specific direction as to the nature and type of accommodations he required. *See* Deposition of Zaracki, dated 22 March 1999, (the "Zaracki Dep.") at 67:14–15.[29] Kohn has not proffered any evidence indicating otherwise. The conclusory allegations of Kohn, without more, are insufficient to overcome the Summary Judgment Motion. *See Maguire,* 912 F.2d at 72; *Schoch,* 912 F.2d at 657; *La Moderna,* 1998 WL 419460, at *3.[30]

29. Relevant portions of the Zaracki Deposition are attached to the Reilly Affidavit as Exhibit B.

30. The Amended Complaint also alleges the Defendants did not "reasonably accomodate [sic] [Kohn's] heart disease." Amended Complaint at ¶ 49. It is further alleged: "[Kohn] during this time was required by Ms. Zaracki and Mr. Leasure to do stressful work with unclear and contradictory requirements provided by Ms. Zaracki, working more than 60 hours per week ...." *Id.* at ¶ 51. Kohn may not rest on his unverified Amended Complaint to oppose the Summary Judgment Motion. *See* Fed.R.Civ.P. 56(c).

Neither Kohn nor the Defendants directly address these allegations concerning Kohn's heart disease on summary judgment; the submissions address only his alleged ADD. As discussed, however, the Defendants urge the general application of the *McDonnell Douglas/Burdine* framework to all of his disability discrimination claims under the ADA. *See* Moving Brief at 11–15; Reply Brief at 3–9; *see also Walton,* 168 F.3d at 666; *Olson,* 101 F.3d at 951 (citing *Newman,* 60 F.3d at 157)("It is now axiomatic that the familiar analytical framework first pronounced in [*McDonnell Douglas* ] for resolution of suits brought under Title VII, also guides an analysis of claims brought under the ADA."). Applying this framework to his conclusory allegations that the Defendants failed to accommodate his heart disease, it appears Kohn cannot state a *prima facie* case of discrimination under the ADA.

Specifically, as stated, Kohn has not met his burden of demonstrating he met the legitimate expectations of his employer. *See Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. Kohn, moreover, has not adduced facts establishing his heart disease places him in a "protected class." *See Olson,* 101 F.3d at 952 (requiring plaintiff suing under the ADA to first show he is a member of a protected class under the *McDonnell Douglas/Burdine* framework). In this regard, Kohn has not offered any evidence indicating his alleged heart disease constituted a physical impairment which substantially limited him in a major life activity. *See* 42 U.S.C. § 12102(2). Nor has Kohn alleged, much more established, he has a record of such impairment or was regarded as having such an impairment. *See id.* Reviewing the unsupported allegations concerning his alleged heart disease pursuant to the *McDonnell Douglas/Burdine* framework, it appears Kohn cannot survive summary judgment as to these claims as well. *See* Fed. R.Civ.P. 56(c).

## C. *Liability of Individual Defendants Under Title VII, the ADEA and the ADA*

The Defendants further argue: "There is no basis in law for holding [D]efendants Zaracki and Leasure individually liable under Title VII, ADEA or the ADA." Moving Brief at 21; *see* Reply Brief at 12.

" '[I]n the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes.' " *Walton,* 168 F.3d at 666 (quoting *Newman,* 60 F.3d at 157); *see DeJoy v. Comcast Cable Communications, Inc.,* 941 F.Supp. 468, 473 (D.N.J.1996). Courts, including the Third Circuit, routinely use the case law under all three statutes interchangeably. *Walton,* 168 F.3d at 666; *DeJoy,* 941 F.Supp. at 474.

When addressing the question of individual liability under these statutes, therefore, case law interpreting any of these statutes is relevant. *See Stults v. Conoco, Inc.,* 76 F.3d 651, 655 (5th Cir. 1996); *Williams v. Banning,* 72 F.3d 552, 553 (7th Cir.1995); *Matthews v. Rollins Hudig Hall Co.,* 72 F.3d 50, 52 n. 2 (7th Cir.1995)(dicta); *Thelen v. Marc's Big Boy Corp.,* 64 F.3d 264, 267 n. 2 (7th Cir.1995)(dicta); *U.S. EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1280 (7th Cir.1995); *Smith v. Lomax,* 45 F.3d 402, 403 n. 4 (11th Cir.1995); *Miller v. Maxwell's Int'l,* Inc., 991 F.2d 583, 587 (9th Cir.), *cert. denied,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Fullman v. Philadelphia Int'l Airport,* 49 F.Supp.2d 434, 441 (E.D.Pa.1999); *Cohen v. Temple Physicians, Inc.,* 11 F.Supp.2d 733, 736 (E.D.Pa.1998)(citing *DeJoy,* 941 F.Supp. at 474).

The Title VII, ADA and ADEA definitions of "employer" are virtually identical. Title VII provides for liability for discriminatory conduct against a "person engaged in an industry affecting commerce who has fifteen or more employees

... and any agent of such a person." 42 U.S.C. § 2000e. The term "employer" under the ADA is similarly defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... [or] any agent of such a person ...." 42 U.S.C. § 12111(5)(A); *see also Sheridan v. E.I. DuPont de Nemours & Co.,* 74 F.3d 1439, 1996 WL 36283, at *13 (3d Cir.), *vacated on other grounds,* 74 F.3d 1439 (3d Cir.1996) (en banc) (observing ADA definition concerning who can be held liable "mirror [those] of Title VII"); *Fitzpatrick v. Commonwealth of Pa.,* No. 99–64, 1999 WL 164476, at *5 (E.D.Pa. Mar. 25, 1999) ("[T]he ADA's definition of 'employer[ ]' ... is in relevant respects identical to Title VII's definition."). Likewise, the ADEA defines "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees ... [or] any agent of such a person." 29 U.S.C. § 630(b); *see also Martin v. United Way of Erie County,* 829 F.2d 445, 448 (3d Cir.1987) (observing similarities in definitions of "employer" in ADEA and Title VII); *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32, 38 (3d Cir.1983). These statutes do not contain similar provisions providing for liability against an individual employee.

Several courts of appeals have considered the question of individual employee liability in cases under the ADA, ADEA and Title VII. The majority of these courts have rejected the concept of employee liability. *See, e.g., Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997) (Title VII); *Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir.1996) (ADA); *Stults,* 76 F.3d at 655 (ADEA), *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–17 (2d Cir.1995) (Title VII); *Gary v. Long,* 59 F.3d 1391, 1399 (D.C.Cir.) (Title VII), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *AIC Security Investigations,* 55 F.3d at 1279–82(ADA); *Cross v. Alabama,* 49 F.3d 1490, 1504 (11th Cir.) (Title VII and ADA), *reh'g denied,* 59 F.3d 1248 (11th Cir.1995); *Smith,* 45 F.3d at 403 n. 4

(Title VII and ADA); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510–11 (4th Cir.) (ADEA), *cert. denied*, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.) (Title VII), *cert. denied*, 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) (Title VII); *Miller*, 991 F.2d at 587 (Title VII and ADA); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) (Title VII).

District court decisions in this Circuit have similarly rejected individual employee liability under these statutes. *See Fullman*, 49 F.Supp.2d at 441 (listing cases in the Third Circuit which have held individual employees cannot be held liable under the ADA); *Johnakin v. City of Philadelphia*, No. 95–1288, 1996 WL 18821, at *6 (E.D.Pa. Jan. 18, 1996) (listing cases in the Third Circuit which have limited liability to the employer); *see also Cohen*, 11 F.Supp.2d at 736–37; *Clarke v. Whitney*, 907 F.Supp. 893, 895 (E.D.Pa.1995); *Ascolese v. SEPTA*, 902 F.Supp. 533, 538 (E.D.Pa.1995); *Clark v. Commonwealth of Pa.*, 885 F.Supp. 694 (E.D.Pa.1995); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 882 F.Supp. 1529, 1531 (E.D.Pa. 1995); *Verde v. City of Philadelphia*, 862 F.Supp. 1329, 1334–1335 (E.D.Pa.1994); *Crawford v. West Jersey Health Sys.*, 847 F.Supp. 1232, 1237 (D.N.J.1994); *Violanti v. Emery Worldwide A–CF Co.*, 847 F.Supp. 1251, 1256–57 (M.D.Pa.1994). *But see Bishop v. Okidata*, 864 F.Supp. 416 423 (D.N.J.1994) (holding the plain language of the ADA subjects supervisory employees, who are agents of the employer, to liability and the distinction between "individual" and "official" liability should be abandoned in ADA cases); *Doe v. Shapiro*, 852 F.Supp. 1246, 1253 (E.D.Pa.1994).

The Third Circuit has not addressed the issue of individual liability under the ADA or the ADEA. It has, however, addressed the issue of individual liability under Title VII. In *Sheridan v. E.I. duPont de Nem-*

*ours and Co.*, 74 F.3d 1439 (3d Cir.), *vacated*, 74 F.3d 1459 (3d Cir.1996).

In *Sheridan*, the plaintiff, a hotel employee, asserted the district court had erred by dismissing her Title VII claims against the general manager of the hotel. 74 F.3d 1439, 1996 WL 36283 at *12. The plaintiff argued, because the term "employer" is defined to include "any agent" of an employer and the hotel general manager was an "agent" of the hotel, the hotel general manager could be held personally liable under Title VII. *Id.* The Third Circuit, in rejecting the argument of the plaintiff, "follow[ed] the great weight of authority from other courts of appeals" and held "an employee cannot be sued." *Id.* at *13 (citations omitted). In its superceding opinion, the Circuit stated:

> The [plaintiff's] arguments are not without some force. However, the clear majority of courts of appeals that have considered this question have held that individual employees cannot be held liable under Title VII .... [W]e are persuaded that Congress did not intend to hold individual employees liable under Title VII.

*Sheridan v. E.I. DuPont de Nemours*, 100 F.3d 1061, 1077–78 (3d Cir.) (citations omitted), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997).

In *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542 (3d Cir.1996), the Circuit again addressed the issue of individual liability under Title VII. There, the plaintiff had been denied workers' compensation benefits for "psychic injuries" resulting from alleged sexual and racial harassment. She brought an action under Title VII and Pennsylvania law. *Id.* at 544.

The *Dici* court held the plaintiff could not sustain her Title VII claims against her supervisors. *Id.* at 552. The Circuit stated:

> When the issue of individual liability was before this court in *Sheridan v. E.I. duPont Nemours*, 1996 WL 36283 (3d Cir.1996), *vacated*, 74 F.3d 1459 (3d Cir.

1996), the court held that an individual employee cannot be liable under Title VII. The majority opinion ... noted the great weight of authority from other courts of appeals holding an employee cannot be sued under Title VII ....

The *Sheridan* opinion was withdrawn when the court voted to take the case *en banc* .... However, the principal focus of the *en banc* briefs and arguments was on Title VII issues other than individual liability. In light of this, we conclude, for the reasons previously given by the court in *Sheridan* and the other courts of appeals, that individual employees cannot be held liable under Title VII.

*Id.; see also Galbraith v. Lenape Regional High School Dist.*, 964 F.Supp. 889, 897 n. 5 (D.N.J.1997); *Caldwell v. KFC Corp.*, 958 F.Supp. 962, 971 (D.N.J.1997); *DeJoy*, 941 F.Supp. at 473–75.

Significantly, Kohn ignores the settled law in this Circuit concerning individual liability under Title VII. He weakly asserts:

> We found no definitive ruling by the Supreme Court as to whether individuals have liability under Title VII, the ADEA or the ADA. While we believe the individuals fall under the strict wording of the statute, as an 'agent' of the employer, we recognize the position taken by the Third Circuit and simply wish to leave the matter open should the Supreme Court definitively decide the question.

Opposition Brief at 4–5. The Third Circuit authority, however, is dispositive of this issue. As indicated, moreover, the ADA and the ADEA similarly define "employer" and share the same basic purpose as Title VII—"'to prohibit discrimination in employment ....'" *Walton*, 168 F.3d at 666 (quoting *Newman*, 60 F.3d at 157). The Title VII, ADEA and ADA claims asserted in the Amended Complaint cannot be sustained as against Zaracki and Leasure. Accordingly, summary judgment in favor of Zaracki and Leasure is granted as to these claims.

Based upon the foregoing, it appears there are no genuine issues of material fact precluding the entry of summary judgment on all of the Federal claims of Kohn.

### D. State Law Claims

As indicated, Kohn has alleged violations of Title VII, the ADA and the ADEA, which provided the basis for removal jurisdiction. Supplemental jurisdiction existed over his State law Claims for CEPA violations and defamation pursuant to 28 U.S.C. § 1367 ("Section 1367").

■ Supplemental jurisdiction enables Federal courts to hear State law claims over which there is no independent basis of jurisdiction. *See* 28 U.S.C. § 1367; *Lee–Patterson v. New Jersey Transit Bus Operations, Inc.*, 957 F.Supp. 1391, 1403–04 (D.N.J.1997)(citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other claims in the action. Pursuant to Section 1367, the "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy ...." 28 U.S.C. § 1367(a); *see also Sinclair v. Soniform, Inc.*, 935 F.2d 599, 603 (3d Cir.1991).

Section 1367(c) permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Carnegie–Mellon*, 484 U.S. at 350, 108 S.Ct. 614 ("When the [F]ederal-law claims have dropped out of the lawsuit in its early stages and only [S]tate-law claims remain, the [F]ederal court should decline the exercise of jurisdiction by dismissing the case without prejudice.")(footnote omitted); *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 198 n. 3 (3d Cir.1991)(dismissal of "pendent [S]tate law claim[ ]" proper

where [F]ederal claims dismissed for lack of subject matter jurisdiction).

As discussed, the Title VII, ADA and ADEA claims raised against the Defendants have been dismissed. Because no other ground for Federal jurisdiction is alleged,[31] the remaining claims are dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3); *Lee–Patterson,* 957 F.Supp. at 1403 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

*Conclusion*

For the reasons set forth above, the Summary Judgment Motion is granted.

---

31. Because it appears that Kohn and the Defendants are residents of New Jersey, *see* Amended Complaint at ¶¶ 2–4; Notice of Removal at 1 and ¶ 2, diversity jurisdiction is lacking. *See* 28 U.S.C. § 1332(a). Kohn, moreover, has alleged no independent basis for jurisdiction over the remaining State law claims. *See* Amended Complaint at ¶ 83.